DOMENGEAUX, Judge.
This is a workmen’s compensation case. Defendant-employer, Rapides General Hospital, and its insurer, United States Fidelity & Guaranty Company (USF&G), are appealing the trial court’s judgment which held plaintiff-employee, Claudia Downs, to be totally and permanently disabled and entitled to workmen’s compensation benefits. Additionally, defendants seek reversal of the trial court’s judgment awarding plaintiff penalties and attorney’s fees. We affirm the findings of disability and entitlement to benefits. However, we reverse that part of the judgment awarding penalties and attorney’s fees.
Defendants assign as error the trial judge’s findings that: (1) plaintiff is totally and permanently disabled; and (2) defendant was arbitrary and capricious in terminating plaintiff’s compensation benefits.
DISABILITY
On July 3, 1976, plaintiff fell in a hall at Rapides General Hospital and suffered a Colles’ fracture[1] of her left wrist. Plaintiff is righthanded. The injury occurred during the course and scope of her employment as a telephone switchboard operator. The plaintiff’s injury was treated at the hospital by Dr. T. E. Banks. A closed reduction was performed under local anesthesia and a long arm cast was applied. After removal of the cast in September, plaintiff began experiencing pain and paralysis in her left hand. On January 25,1977, Doctor Banks referred the plaintiff to Dr. Ray J. Haddad, an orthopedic surgeon specializing in hand surgery at the Tulane University Medical School.
Doctor Haddad examined plaintiff on February 9,1977, confirming Doctor Banks’ suspicion of carpal tunnel syndrome[2] in plaintiff’s left hand. An electromyelogra-phy performed on February 23, 1977, in Monroe, Louisiana, confirmed the diagnosis. Upon Doctor Haddad’s recommendation, Doctor Banks referred plaintiff to Dr. C. W. Lowrey, an orthopedic surgeon, who performs hand surgery for the Alexandria Orthopedic Clinic.
On March 17, 1977, Doctor Lowrey performed a carpal tunnel release to relieve pressure on the median nerve going into the left hand. Doctor Lowrey discharged plaintiff to return to work on August 15, 1977, assessing a 20% permanent partial impairment of her left hand. Plaintiff continued to experience pain and numbness in her left hand.
Plaintiff returned to work as a telephone switchboard operator in August, 1977, but continued having problems with her left hand. Doctor Haddad performed a second carpal tunnel release on February 18, 1979. On August 8, 1979, Doctor Haddad discharged plaintiff to return to work assessing a 25% permanent partial impairment of her left hand.
Plaintiff returned to work in October, 1979, as the operator of the defendant hospital’s Tel-Med program, a job she could perform using only one hand. She resigned on March 14, 1980, citing the pain she continually experienced in her left hand as her reason for leaving.
Dr. Don K. Joffrion, an orthopedic surgeon, examined plaintiff twice (on September 25, 1979, and March 25, 1980) at the request of plaintiff’s attorney and diagnosed her condition as Sudeck’s atrophy, or *118 Causalgia.[3] He believed the pain associated with these conditions would prevent the plaintiff from returning to work.
The trial judge delivered extensive written reasons finding the plaintiff to be totally and permanently disabled due to substantial pain. In conclusion, the trial judge stated:
“Pain is a question of fact that must be determined after an evaluation of all the facts and evidence adduced at trial. Generally a trier of fact has made available to him only the ‘opinions’ of experts and the trial is void of any facts which the court may actually view, touch or examine. Such is not true with the case at hand for I was able to observe the change that took place in the color of plaintiff’s hand from early that morning when the courtroom was cold until later that afternoon when the courtroom was hot. It was blue when the courtroom was cold and red when the courtroom was hot; the topside skin was atrophic, thin and mummified; the color of the skin on the underside of the hand was mottled; the skin around the fingernails was tight, white and abnormal in appearance; the dryness of the little finger when I ran my fingers across it; the claw shape of the hand; the inability of plaintiff to extend the fingers; the inability of plaintiff to make a closed fist; the inability of the plaintiff to bend her fingers downward; and the obvious pain she experienced when she attempted these maneuvers. I say obvious pain because I do not believe that the trembling, and shaking of her entire hand and arm in the manner it occurred and the grimace that appeared on her face could be faked. I have known Mrs. Downs for many years and know her to be a very conscientious, dedicatéd, hard working and truthful individual. She is a type individual that would tell the truth even though it might have an adverse effect on the outcome of her pending litigation. I could accept her testimony in absence of Dr. Joffrion’s but his must be mentioned since it corroborates not only Mrs. Downs’ version of what is present but it also affirms the objective symptoms found by Dr. Lowrey, Dr. Had-dad, and this Court.”
This Court in Kelly v. International Union Operating Engineers, 386 So.2d 1060 (La.App. 3rd Cir. 1980), recently stated:
“It is well settled that an injured worker who suffers substantial pain in performing his former job or who cannot engage in any gainful employment without incurring substantial pain is disabled, either totally or partially. Phillips v. Dresser Engineering Company, 351 So.2d 304 (La.App. 3 Cir. 1977), writ denied, 353 So.2d 1048 (La.1978); Rachal v. Highlands Insurance Company, 355 So.2d 1355 (La.App. 3 Cir. 1978), writ denied, 358 So.2d 645 (La.1978); Whitaker v. Church’s Fried Chicken, Inc., 387 So.2d 1093 (La.1980).
We note at the outset that physical inability to return to work and inability to return to work due to substantial pain are questions of fact. The determination of fact made by a trial court will not be disturbed when there is evidence before the court, which evidence, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s findings, unless those findings are clearly wrong. Crump v. Hartford Accident and Indemnity Company, 367 So.2d 300 (La.1979). In this regard, we stated in Conlay v. Houston General Insurance Company, supra, 370 So.2d 196 at page 200 (La.App. 3 Cir. 1979):
‘... The trial court’s favored position in seeing and hearing live witnesses is especially important when the factual determination involves a concept as subjective as pain. Colorful inflections and subtle nuances given to spoken and physical expressions describing the degree of pain simply do not come out in the black and white transcription of testimony contained in the appellate record.’ ”
*119 A review of the evidence shows no manifest error on the part of the trial judge in finding the plaintiff to be totally and permanently disabled due to substantial pain and therefore, that portion of the judgment will be affirmed.
PENALTIES AND ATTORNEY’S FEES
The trial judge awarded plaintiff compensation benefits at the rate of $68.80 per week from the date of the accident, less credit for the weeks compensation benefits were paid. He also found that the defendants’ refusal to pay benefits after plaintiff resigned from her job as Tel-Med operator on March 14, 1980, less than three weeks before trial, was arbitrary and capricious so he awarded plaintiff statutory penalties of 12% and $4,000.00 as attorney’s fees. The trial court committed manifest error in finding that the defendants’ refusal to resume benefits after March 14, 1980, was arbitrary and capricious. The record discloses that a conflict in up-to-date medical opinions existed at the time that plaintiff resigned from her job as a Tel-Med operator on March 14, 1980.
Between the date of the accident (July 3, 1976) and the date the defendants received Doctor Joffrion’s first report in late September 1979, the defendants received many reports from Doctors Banks, Lowrey, and Haddad. Most of these reports were encouraging and indicated that plaintiff’s condition was steadily improving. These reports referred only to a percentage of residual impairment of the hand; none indicated that plaintiff would suffer any pain by returning to work. Throughout this period of time, the defendants paid all of plaintiff’s medical expenses and paid compensation benefits of $68.80 per week for each week she was out of work as a result of the accident.[4]
Doctor Joffrion examined plaintiff for the first time on or about September 25, 1979. Based on this examination he wrote a report indicating, among other things, that plaintiff must be experiencing pain as a result of her left hand injury. He did not believe that plaintiff could continue as an operator of a PBX machine, nor did he believe that she could be gainfully employed at that time, due to the injury. It must be remembered that plaintiff was receiving compensation of $68.80 per week when Doctor Joffrion made his bleak forecast for plaintiff’s future.
Subsequent to Doctor Joffrion’s initial report, plaintiff again was examined by Doctor Haddad on October 15, 1979, at which time he informed the defendants’ counsel that plaintiff was discharged from his care. To plaintiff’s hand Doctor Haddad assigned a residual impairment of 25% permanent partial disability. On his clinic notes pertaining to this last examination, Doctor Haddad noted that plaintiff was “about the same”, apparently referring to his most recent examination of plaintiff on August 8, 1979, when he opined that she could return to work.
On October 26, 1979, plaintiff voluntarily returned to work as an operator of the defendant hospital’s Tel-Med program. On February 28, 1980, plaintiff signed an employee resignation form. She stated that she was resigning because the injury to her left hand caused her constant pain even though her job as Tel-Med operator did not require the use of her left hand.
Prior to the effective date of her resigna-tion on March 14, 1980, plaintiff was examined one last time by Doctor Lowrey on March 11,1980. He assigned a 30% residual impairment of her hand but felt she could continue her work as a telephone operator. This final report by Doctor Lowrey prior to trial did not mention pain as a factor.
*120 Finally, plaintiff was re-examined by Doctor Joffrion on March 25, 1980, one week before trial. He again reported to plaintiff’s attorney by letter dated March 25,1980, that plaintiff was obviously suffering from severe residual neurogenic pain in the left hand. Although the record is not completely clear on the subject, it appears that defendant received a copy of Doctor Joffrion’s second report no more than a week prior to trial, which was held on April 1, 1980.
To recapitulate, when plaintiff voluntarily returned to work on October 26,1979, the date her compensation payments were discontinued, the defendants had a September 25, 1979, report from Doctor Joffrion indicating that plaintiff was experiencing pain in her hand and could not return to work. However, the defendants also had a later conflicting report dated October 17, 1979, from Doctor Haddad indicating that plaintiff had a 25% permanent partial disability of her hand as a whole, but that she could return to work. His report did not mention pain as a factor.
At the time of trial on April 1, 1980, the defendants possessed a March 11, 1980, report from Doctor Lowrey wherein he assigned a 30% permanent partial disability of plaintiff’s hand as a whole. Like Doctor Haddad, Doctor Lowrey felt that plaintiff could continue her work as a telephone operator. His report, again like Doctor Had-dad’s, did not mention that plaintiff’s pain was substantial enough to prevent her from working. Finally, shortly before trial, defendants received a second report from Doctor Joffrion, wherein he reiterated his findings of pain and persisted in the view that plaintiff could not return to work.
When a workmen’s compensation insurer possesses up-to-date but conflicting medical opinions from two or more competent medical authorities, a decision to refuse compensation benefits based upon the report or reports which indicate the injured employee can return to work is not arbitrary or capricious. Lemoine v. Employers Casualty Company, 378 So.2d 594 (La.App. 3rd Cir. 1979), writ denied 380 So.2d 101 (La.1980); Johnson v. United States Fidelity & Guaranty Company, 276 So.2d 735 (La.App. 3rd Cir. 1973); Brooks v. Acme Carton Corporation, 312 So.2d 924 (La.App. 4th Cir. 1975), writ denied 318 So.2d 48 (La.1975).
Confronted with these up-to-date but very conflicting medical reports, there can be no question that the defendants were justified in basing their refusal to resume compensation payments after March 14, 1980, upon the medical reports supplied by Doctors Haddad and Lowrey.
In pursuing plaintiff’s claim for penalties and attorney’s fees, plaintiff’s counsel relies upon the following statement from Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976), which was repeated in Carter v. American Mutual Liability Insurance Company, 386 So.2d 1072 (La.App. 3rd Cir. 1980):
“If, subsequent to an initial optimistic report, an insurer receives medical information showing disability at a subsequent date, the insurer may not blindly rely upon the earlier report and solely on its basis avoid penalties for arbitrary nonpayment of compensation benefits indisputably due a disabled workman.”
Although the above quote states an accurate principle of law, that principle has no application in this case because, after receiving Doctor Joffrion’s first report the defendants received a later report from Doctor Haddad who had been seeing the plaintiff frequently. Doctor Haddad’s October 17,1979 report indicated that plaintiff could return to work. (We note that a week later plaintiff did return to work.) Again, when plaintiff expressed her intention to resign from her Tel-Med job because of pain, she was sent to Doctor Lowrey, another specialist who was thoroughly familiar with the plaintiff’s case. He felt, as Doctor Haddad did, that plaintiff could continue her job as a telephone operator.
Rather than being analogous to the Walker and Carter cases, this case more closely resembles Hall v. Houston General Insurance Company, 377 So.2d 561 (La.App. *121 3rd Cir. 1979), writ denied 879 So.2d 10 (La.1980), wherein penalties and attorney’s fees were denied when the compensation insurer promptly responded to a pessimistic medical report by sending the plaintiff to another qualified physician for his evaluation.
For the above reasons, the judgment of the district court, insofar as it assessed penalties and attorney’s fees against the defendants, is hereby reversed; in all other respects it is affirmed.
Costs on appeal are assessed one-half to plaintiff-appellee, and one-half to defendants-appellants.

REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.

. A break in the lower end (i. e., near the wrist) of the radius, the outer of the two bones of the forearm (i. e., the bone which is on the thumb side of the forearm). The break is usually within an inch of the end of the bone, and the short fragment is usually displaced toward the back or hairy side of the forearm. The wrist is similarly displaced, and the hand is turned toward the thumb side of the forearm.

. A condition resulting from pressure on the median nerve as it traverses the carpal tunnel, usually by fibers of the transverse carpal ligament. The condition is characterized by pain, tingling, burning, numbness, etc. in the areas supplied by the nerve, i. e., in the skin of the palm, fingers, wrist, etc. There may also be swelling of the fingers and atrophy of some of the muscles, especially those at the base of the thumb.

. These conditions are explained in sections of Orthopaedics Principles and Their Applications by Samuel L. Turek, M. D., placed into evidence by the plaintiff. Both can result from injury to the median nerve and cause pain, swelling, stiffness, etc. in the hand.

. The record shows that compensation was paid from July 3, 1976, to August 15, 1977, was discontinued while plaintiff was working from August 16, 1977, to February 15, 1979, and was paid again from February 16, 1979, to October 26, 1979, when plaintiff returned to work a second time. The amount of compensation paid totalled $6,467.20, representing 94 weeks at $68.80 per week. This amount exceeded the amount plaintiff would have been entitled to under the schedule for partial loss of use or function of the hand as set forth in La.R.S. 23:1221(4)(e) and (o).